IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**NORFOLK SOUTHERN RAILWAY
COMPANY,**                                         Case Number 3:14cv918

       Plaintiff,

       v.                                          Magistrate Judge James R. Knepp, II

**CITY OF TOLEDO,**

       Defendant.                                MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Norfolk Southern Railway Company moves for summary judgment on Count One of their Complaint against Defendant City of Toledo ("the City"). (Doc. 17). The City opposed the Motion (Doc. 18) and Plaintiff replied (Doc. 23).

In Count One, Plaintiff seeks a declaration that various provisions of the Toledo Municipal Code ("TMC") related to land use, construction, and occupancy permits, when applied to transportation by a rail carrier, are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, which vests exclusive jurisdiction over such matters in the Surface Transportation Board ("S.T.B."). (Doc. 1, ¶1).

The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 8). For the following reasons, Plaintiff's motion is granted. (Doc. 17).

BACKGROUND[1]

Plaintiff is a "rail carrier" under the ICCTA, 49 U.S.C. § 10102(5), and the City is a duly organized municipality under the laws of the State of Ohio. (Doc. 16, at ¶¶2-3). This action arises from Plaintiff's construction, occupation, and utilization of a new transportation/crew building ("Crew Building") in its Mega/Airline Yard ("the Yard"), located in Toledo, Ohio, without submission to the City's building code process. (Doc. 16, at ¶¶4-5, 13-14).

The City's building code is a plan review, approval, and inspection process established pursuant to Chapters 3781 and 3791 of the Ohio Revised Code. (Doc. 16, at ¶10). The building code adopts the standards of the Ohio Building Code, the National Electric Code, and other associated mechanical and building codes as identified in TMC Part 13. (*Id.*). In pertinent part, the City's building code related to the Crew Building requires Plaintiff to submit and receive approval of a Plan Review Application and Fees form, Building Permit Application, Electrical Permit application, Heating/Air-Conditioning Permit application, and Plumbing Permit application. *Id.* In addition to the various permits, Plaintiff would be required to submit to and pass various inspections by the City as provided in TMC Part 13, which would be geared toward verifying that actual construction complies with approved plans and meets city and state minimum standards. (Doc. 16, at ¶11).

In early August 2013, Plaintiff commenced construction of the Crew Building in the Yard. (Doc. 16, at ¶¶5, 8). The Yard, through which Plaintiff engages in interstate rail operations, is the junction of Plaintiff's Chicago and Detroit mainlines and contains 34 yard tracks on which rail cars are switched for interstate travel. (Doc. 16, at ¶4). Approximately 100 trains per day flow through the yard, with a number of trains being diverted from the mainline

---

1. The following background information is based on the parties' Joint Stipulation of Facts (Doc. 16) and amendment thereto (Doc. 21).

tracks onto the Yard tracks where blocks of rail cars are switched for interstate transport. (Doc. 16, at ¶17). Although Plaintiff delivered notice to the City of its intention to construct the Crew Building, provided electronic copies of the building plans, and offered an opportunity for post-construction inspection, these actions were meant only as a "courtesy" and did not strictly comply with the City's building code requirements. (Doc. 16, at ¶¶5-7, 10-12).

In October 2013, the City advised Plaintiff's general contractor that the construction was subject to applicable building codes, but did not issue a stop work order at that time because the project manager informed the City hard-copy plans and specifications would be forthcoming. (Doc. 21, at ¶9). In late January 2014, as construction of the Crew Building neared completion, the City notified Plaintiff it would be required to follow the City's building code relating to the Crew Building's construction and on January 24, 2014, issued a stop work order, which was later withdrawn without prejudice. (Doc. 21, at ¶9). To date, the City has not taken further enforcement action regarding the Crew Building. (Doc. 21, at ¶9). The Crew Building is now completed, occupied by Plaintiff, and placed into service. (Doc. 16, at ¶15).

The Crew Building is manned by Plaintiff's personnel 24 hours per day, 365 days per year, and houses approximately 110 employees who work in both transportation and mechanical capacities. (Doc. 16, at ¶18). Transportation employees, including engineers and trainmen, report to work at the Crew Building, log onto computers, and receive operations bulletins, job briefings, and work assignments, and then move rail traffic within the Yard and beyond, utilizing the Crew Building for requisite breaks, including eating and showering. (Doc. 16, at ¶19). The mechanical employees, such as electricians and carmen, report to work at the Crew Building, log onto computers and receive safety and job briefings and work assignments, then perform necessary

mechanical work within the Yard and beyond, also utilizing the Crew Building for requisite breaks. (Doc. 16, at ¶20).

In addition, the Crew Building houses the yardmaster, who is responsible for directing traffic in and out of the Yard, including traffic on the mainlines and within the Yard itself, and assigns tasks to the transportation and mechanical employees. (Doc. 16, at ¶21). The yardmaster works from a window-encased, square-shaped office which enables him or her to oversee much of the Yard. (Doc. 16, at ¶21).

Plaintiff has not submitted to the City's building code process because it maintains it is preempted by federal law. (Doc. 16, at ¶14). For its part, the City argues the current occupation and use of the Crew Building is unlawful. (Doc. 16, at ¶¶13, 15).

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## ANALYSIS

The issue presented is whether the ICCTA preempts those portions of the City's building code related to land use, construction, and occupancy permits as applied to the Crew Building.

The federal preemption doctrine arises from the Supremacy Clause of the U.S. Constitution, which sets forth, "the Laws of the United States" made in pursuance of the Constitution "shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2; *State Farm Bank v. Reardon*, 539 F.3d 336, 341 (6th Cir. 2008). "Laws of the United States" include federal statutes and "federal regulations that are properly adopted in accordance with statutory authorization." *Id*. (quoting *City of New York v. FCC*, 486 U.S. 57, 63 (1988)). Under the preemption doctrine, any state law that interferes with or contradicts a federal regulation or an Act of Congress is invalid. *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 516 (1992).

The Sixth Circuit has previously applied the S.T.B.'s "comprehensive test for determining the extent to which a particular state action or remedy is preempted by [the ICCTA]." *Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 539-40 (6th Cir. 2008). Under this test, state actions are "categorically" or "facially" preempted if they "would directly conflict with exclusive federal regulation of railroads." *Adrian & Blissfield R.R. Co.*, 550 F.3d at 540 (quoting *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008)). Courts and the S.T.B. have recognized "two broad categories of state and local actions" that are categorically preempted:

> (1) "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized" and

> (2) "state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service"[.]

5

*Adrian & Blissfield R.R. Co*., 550 F.3d at 540 (quoting *CSX Transp., Inc – Petition for Declaratory Order,* S.T.B. Finance Docket No. 34662 (2005), *available at* 2005 WL 1024490, at *2). State regulations that fall into these two categories are "*per se* unreasonable interference with interstate commerce". *CSX Transp., Inc.*, 2005 WL 1024490, at *3.

State regulations that do not fall into one of the above-stated categories may be preempted as applied. Indeed, "[f]or state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." *Adrian & Blissfield R.R. Co.*, 550 F.3d at 540 (quoting *Barrois*, 533 F.3d at 332). "Regardless of the preemption at issue", the court must "'determine whether state regulation is consistent with the structure and purpose' of federal law." *Reardon*, 539 F.3d at 342.

The ICCTA grants the S.T.B. exclusive jurisdiction over "transportation by rail carriers", "facilities of such carriers", and "the construction . . . of . . . facilities". 49 U.S.C. §§ 10501(b)(1)-(2). The parties agree Plaintiff is a "rail carrier". (Doc. 16, at ¶16). Under the ICCTA, "transportation" includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
>
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

§§ 10102(9)(A), (B).

Of relevance here, the S.T.B. previously addressed preemption under the ICCTA with respect to a railroad's construction of a truck terminal, weigh station, and corn processing plant without appropriate municipal approvals and permits. Its analysis is instructive:

6

Building Codes

Given the broad language of 49 U.S.C. 10501(b) and the case law interpreting it, our preliminary view is that local entities such as the Borough can not require that railroads seek building permits prior to constructing or using railroad facilities because of the inherent delay and interference with interstate commerce that such requirements would cause. At the same time, we believe local authorities can take actions that are necessary and appropriate to address any genuine emergency on railroad property, and that interstate railroads such as NYSW are not exempt from certain local fire, health, safety and construction regulations and inspections.

Specifically, under the law enacted by Congress, as interpreted by the courts, it appears to us that state and local entities can enforce in a non-discriminatory manner electrical and building codes, or fire and plumbing regulations, so long as they do not do so by requiring the obtaining of permits as a prerequisite to the construction or improvement of railroad facilities. With regard to the kinds of inspections that are permissible on property owned or used by interstate railroads, the potential for interference depends on the nature of the action by the state or local government and the effect on rail transportation and Board remedies; we see no simple, clear line of demarcation that has been or could be drawn, except that the inspection requirements or local regulations must be applied and enforced in a non-discriminatory manner and that preclearance permitting requirements plainly are preempted. Again, we cannot go beyond these general principles here without more information about particular inspection and similar requirements that may be at issue in this case.

*Borough of Riverdale – Petition for Declaratory Order – The New York Susquehanna and Western Railway Corporation*, S.T.B. Finance Docket No. 33466 (Sept. 1999), *available at* 1999 WL 715272 (internal citations omitted).

In the same vein, the S.T.B. concluded in *Joint Petition for Declaratory Order – Boston and Maine Corp. and Town of Ayer, MA* that "state and local permitting or preclearance requirements . . . are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations." S.T.B. Finance Docket No. 33971 (2001), *available at* 2001 WL 458685, at *5; *see also*, *Soo Line R.R. Co. v. City of Minneapolis*, 38 F.Supp.2d 1096, 1099 (D. Minn. 1998) ("The Court concludes that the City's demolition permitting process upon which the

Defendants have relied to prevent [the railroad] from demolishing five buildings . . . that are related to the movement of property by rail is expressly preempted").

However, as the S.T.B. suggested in *Borough of Riverdale*, "state and local regulation is permissible where it does not interfere with interstate rail operations", and, "localities retain certain police powers to protect public health and safety[]", such as when regulating potentially harmful waste disposal. *Id*. The S.T.B. reiterated, "[w]hile a locality can not require permits prior to construction, the courts have found that a railroad can be required to notify the local government 'when it is undertaking an activity for which another entity would require a permit' and to furnish its site plan to the local government." *Id*. (quoting *Borough of Riverdale*, S.T.B. Finance Docket No. 33466 (1999)). Additionally, the New Jersey Supreme Court has held, in part, that a railroad may not deny local government access for reasonable inspection of its maintenance facility. *Village of Ridgefield Park v. New York, Susquehanna & Western Ry.*, 750 A.2d 57 (N.J. 2000).

Here, Plaintiff argues the ICCTA "broadly and expressly preempts local regulation of transportation of rail carriers", including "[t]he City's attempt to regulate [Plaintiff]'s construction, occupation, and use of the Crew Building". (Doc. 17, at 5-6). The City argues for an "as applied" preemption analysis because it claims the TMC does not "*by its nature*" deny "Plaintiff the ability to conduct some or part of its operations." (Doc. 18, at 5-6). Under this standard, the City argues its building codes would not "unreasonably interfere" with railroad transportation, therefore, the regulations are permissible. (Doc. 18, at 5-7). For the following reasons, the Court finds the ICCTA categorically preempts the City's pre-construction and preclearance permitting and inspection requirements related to the use, construction, and occupation of the Crew Building.

It is uncontroverted that the Crew Building is located in the Yard, through which approximately 100 trains pass through per day over 34 tracks. (Doc. 16, at ¶4, 5, 8, 17). It is also undisputed that the Crew Building is staffed around the clock by approximately 110 employees who work in and on the trains, for example, as train engineers, trainmen, and mechanics. (Doc. 16, at ¶¶18-19). Further, there is no doubt that the Crew Building houses the yardmaster, who directs train traffic in and out of the Yard from a window-encased office, which allows him or her to oversee much of the Yard. (Doc. 16, at ¶21).

For these reasons, the Crew Building easily fits within the meaning of "transportation by rail carriers", which includes, in relevant part, a "property" or "facility[] . . . of any kind related to the movement of passengers or property, or both, by rail", and over which the S.T.B. has exclusive jurisdiction. 49 U.S.C. §§ 10102(9)(A), 10501(b)(1)-(2); *Soo Line RR.. Co.*, 38 F.Supp.2d at 1099 (D. Minn. 1998) ("when section 10501(b) grants the STB exclusive jurisdiction over 'transportation by rail carriers,' it logically includes the yard, property, facilities and any intermodal equipment used in connection with a railroad, or related to the movement of passengers or property."). As a general matter, "any state and local laws or regulations that intrude upon [the ICCTA's] jurisdiction are preempted". *Railroad Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 561-63 (6th Cir. 2002).

Notably, this conclusion is consistent with the purposes of the ICCTA set forth by Congress "because of the inherent delay and interference with interstate commerce that such requirements would cause." *Borough of Riverdale*, S.T.B. Finance Docket No. 33466; *see also, Adrian & Blissfield R. Co.*, 550 F.3d at 539 ("Courts and the STB have recognized . . . any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities the board has

9

authorized" is categorically preempted); *Boston and Maine Corp. and Town of Ayer, MA*, S.T.B. Finance Docket No. 33971 (2001) ("a locality can not require permits prior to construction"); *Green Mountain R.R. Corp v. Vermont*, 404 F.3d 638, 642-43 (2d Cir. 2004) (finding a "pre-construction permit requirement is preempted").

Indeed, the ICCTA was passed, in part, "to abolish the Interstate Commerce Commission" and "to reform economic regulation of transportation". *H.R.Rep. No.* 104-311, at 1 (1995). "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." *Adrian & Blissfield R.R. Co.*, 550 F.3d at 539 (quoting *H.R.Rep. No.* 104-311, at 95-96). "Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." *H.R.Rep. No.* 104-311, at 96. Courts agree it was Congress' intent to vest broad regulatory authority over rail transportation with the S.T.B. *See, e.g., Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009); *Canadian Nat. Ry. Co. v. City of Rockwood*, 2005 WL 1349077, at *4 (E.D. Mich.); *Green Mountain R.R. Corp,* 404 F.3d 638 at 642; *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029-31 (9th Cir. 1998); *CSX Transp., Inc. v. Georgia Public Service Com'n*, 944 F.Supp. 1573, 1581 (N.D. Ga. 1996); *Soo Line R.R. Co.*, 38 F. Supp. 2d at 1099.

It is important to emphasize, that this holding does not categorically invalidate all sections of the City's building code as applied to the Crew Building. Doing so would ostensibly be outside the scope of Plaintiff's Motion and Complaint. *See, e.g.,* (Doc. 17, at 2) (Plaintiff asks the Court to find the "City of Toledo's formal permitting process as applied to Norfolk Southern's Crew Building at the junction of its Chicago and Detroit mainlines is preempted.");

10

(Doc. 1, at ¶¶12-20) (asserting in Count One that "the City's formal permitting process, including the requisite submission of applications and securance of permits for plan review, building, electrical, HVAC, plumbing and/or occupancy, is preempted by ICCTA").

Further, the Sixth Circuit set forth that the ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect." *Adrian & Blissfield R.R. Co.*, 550 F.3d at 539. Consistent with federal court and S.T.B. decisions, the Court finds pre-construction and preclearance permitting and inspection requirements have the effect of managing or governing rail transportation; however, it is not clear at this time that all of TMC part 13 would have the same concern. *See, e.g., Joint Petition for Declaratory Order – Boston and Maine Corp. and Town of Ayer, MA*, 2001 WL 458685, at *5 ("a locality can not require permits prior to construction, [but] the courts have found that a railroad can be required to notify the local government 'when it is undertaking an activity for which another entity would require a permit' and to furnish its site plan to the local government.") (quoting *Borough of Riverdale*, S.T.B. Finance Docket No. 33466 (1999)); *Green Mountain*, 404 F.3d at 643 ("Electrical, plumbing, and fire codes, direct environmental regulations enacted for the protection of public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption."); *Adrian & Blissfield R.R. Co.*, 550 F3d 533 (finding the ICCTA did not preempt local law requiring the railroad to pay for the installation and upkeep of sidewalks that abut and cross railroad property).

## CONCLUSION

The Court finds no genuine issue of material fact that when applied to the Crew Building, the ICCTA categorically preempts the City's pre-construction and preclearance permitting and

11

inspection requirements related to the use, construction, and occupation of the Crew Building.

Therefore, consistent with this Memorandum Opinion and Order, Plaintiff's motion is granted.

(Doc. 17). Further, Plaintiff's second and only remaining claim for relief, which is stated in the

alternative to the request for declaratory judgment, is dismissed as moot. (Doc. 1).

    IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge